IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GREG NULMAN and                          :
TATYANNA KNYAZHESKY,                     :
                                         :
        Plaintiffs,                      :
                                         :
        v.                               :        CIVIL ACTION NO. 2:09-cv-01503-JF
                                         :
MONEY WAREHOUSE, INC.,                   :
COUNTRYWIDE BANK, FSB                    :
                                         :
        Defendants.                      :

## PROPOSED ORDER

        AND NOW, this ___ day of _____, 2010, upon consideration of

the Motion of Defendant Countrywide Bank, FSB ("Countrywide") for Summary

Judgment, and any response thereto, it is hereby ordered that the motion is GRANTED,

and all claims against defendant Countrywide are DISMISSED, with prejudice.

                                        BY THE COURT:


                                        _____
                                        John P. Fullam, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GREG NULMAN and                          :
TATYANNA KNYAZHESKY,                      :
                                          :
        Plaintiffs,                       :
                                          :
        v.                                :       CIVIL ACTION NO. 2:09-cv-01503-JF
                                          :
MONEY WAREHOUSE, INC.,                    :
COUNTRYWIDE BANK, FSB                     :
                                          :
        Defendants.                       :

## MOTION OF DEFENDANT COUNTRYWIDE BANK, FSB
## FOR SUMMARY JUDGMENT

        Defendant Countrywide Bank, FSB ("Countrywide"), by its undersigned

counsel, hereby moves for summary judgment on plaintiffs' claims.

        In support of its motion, Countrywide relies on the accompanying

memorandum of law.

                                    /s/ *Joel E. Tasca*
                                    Martin C. Bryce, Jr., Esquire
                                    Joel E. Tasca, Esquire
                                    BALLARD SPAHR LLP
                                    1735 Market Street, 51st Floor
                                    Philadelphia, PA  19103-7599
                                    Telephone: 215.864.8238/8188
                                    Facsimile: 215.864.8999
                                    bryce@ballardspahr.com
                                    tasca@ballardspahr.com

                                    *Attorneys for Defendant*
Dated:  June 8, 2010                *Countrywide Bank, FSB*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GREG NULMAN and      :
TATYANNA KNYAZHESKY,   :
            :
 Plaintiffs,       :
            :
 v.          :  CIVIL ACTION NO. 2:09-cv-01503-JF
            :
MONEY WAREHOUSE, INC.,   :
COUNTRYWIDE BANK, FSB   :
            :
 Defendants.      :

## MEMORANDUM OF DEFENDANT
## COUNTRYWIDE BANK, FSB IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

   Defendant Countrywide Bank, FSB ("Countrywide"), by its undersigned

counsel, respectfully submits this memorandum of law in support of its motion for

summary judgment.

## I.  INTRODUCTION

    This action arises out of an adjustable rate mortgage loan ("ARM") that

Plaintiffs received from defendant Money Warehouse, Inc. ("MW").  Plaintiffs allege a

violation of the federal Truth in Lending Act ("TILA") based on a purported defect in the

Notices of Right to Cancel that they admit they received at the loan closing.  They also

allege a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection

Law (the "UTPCPL"), arising out of MW's alleged misrepresentations prior to the loan

closing as to the terms of the loan, and on MW's alleged misrepresentation that the terms

of the loan were the best available to Plaintiffs.

Based on the foregoing allegations, Plaintiffs have sued not only MW, but also Countrywide.[1]  Countrywide's only connection to this case, however, is that MW – as a correspondent lender for Countrywide and its affiliates – had access to and used the Countrywide automated system of determining whether Countrywide would purchase the loan if made by MW.  Countrywide in fact purchased Plaintiffs' loan from MW after the loan closed.

None of these facts, however, render Countrywide liable on Plaintiffs' claims.  The TILA claim – which seeks rescission of the loan – is barred by the three-year statute of repose for TILA rescission claims.

The TILA claim additionally fails because the particular purported defect in the Notices of Right to Cancel – as courts have repeatedly held – does not render the Notices non-compliant with TILA.  Moreover, *new* Notices of Right to Cancel that indisputably complied with TILA were sent to Plaintiffs shortly after the loan closing, thereby curing the alleged defect in the original Notices.

The UTPCPL claim fails against Countrywide because the evidence unequivocally establishes that no one from Countrywide ever even communicated with Plaintiffs prior to the loan closing, much less made misrepresentations to them.  Instead, as Plaintiffs admitted at deposition, they dealt exclusively with MW prior to the loan closing.  Nor can Countrywide be held responsible for Plaintiffs' complaint that the ARM they received was not the best loan available to them.  The evidence is unequivocal that

---

[1]  Plaintiffs originally sued in this action Countrywide Home Loans, Inc. ("CHL"), instead of Countrywide.  In its Answer dated August 28, 2009, CHL denied ever having owned Plaintiffs' loan.  The Court dismissed CHL as a party to this action by Order dated May 6, 2010.

Countrywide played no role whatsoever in the decision to select the ARM that Plaintiffs received.  Instead, MW was the party that made this decision.  In fact, the evidence is undisputed that Countrywide's automated system permitted MW to evaluate *all* types of loans that Countrywide would purchase if made by MW, but MW chose to select *only* the ARM Plaintiffs received.

## II.    UNDISPUTED FACTS

In 2006, Plaintiffs contacted MW in order to refinance the existing mortgage loans on their home.  (Nulman Dep. pp. 36-38).[2]  At the time, MW was a "correspondent lender" for Countrywide, which means that, if MW so chose, it could make a loan, and Countrywide or its affiliates then could elect to purchase the loan from MW after the loan closed if the loan complied with Countrywide's underwriting standards.  (J. Greives Dep. p. 7).[3]  MW and Countrywide, however, did not have an exclusive relationship, and thus MW was free to shop its customers' loan applications to any other lender.  (*Id.* p. 27).

As part of its correspondent lending relationships, Countrywide made an automated underwriting system – called Countrywide's Loan Origination and Underwriting Technology ("CLOUT") – available to its correspondent lenders, including MW, to serve as a tool in the underwriting process.  (*Id.* p. 8).  CLOUT gave correspondent lenders, such as MW, the ability to determine for which of Countrywide's more than 200 loan programs a borrower might qualify.  (*Id.* pp. 33-34, 49, 56).  In fact, a

---

[2]     The portions of Mr. Nulman's deposition transcript cited herein are collectively attached hereto as Exhibit A.

[3]     The portions of Mr. Greives' deposition transcript cited herein are collectively attached hereto as Exhibit B.

correspondent lender could simply select the "all" option in CLOUT, and CLOUT would then determine all fixed rate loans and all ARMs for which the prospective borrower might qualify.  (*Id.*).  Thus, CLOUT enables the correspondent lender to determine which loan program would provide the prospective borrower with the lowest monthly payment and lowest interest rate.  (*Id.* p. 47).  Countrywide did not play any role in the correspondent lender's decision as to what to input into CLOUT.  (*Id.* pp. 34-37).

In the instant case, MW did *not* select the "all" option in CLOUT, and instead MW chose to determine whether Plaintiffs were eligible for just a single type of ARM.  (*Id.* pp. 34-37, 47-48, 55-56).

The closing on Plaintiffs' loan occurred on June 9, 2006.  Plaintiffs admit that they signed all the loan documents that were presented to them at closing.  (G. Nulman Dep. p. 53; T. Knyazhesky Dep. pp. 20-21).[4]  Among the documents plaintiffs received and signed at closing were Notices of Right to Cancel that were provided to Plaintiffs pursuant to TILA.  (Notices of Right to Cancel, dated 6/9/06, T. Knyazhesky Dep. Exh. 1, attached hereto as Exhibit D); (T. Knyazhesky Dep. pp. 26-27).  These Notices stated:

> You are entering into a transaction that will result in a mortgage, lien or security interest on or in your home.  You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:
>
> 1.     the date of the transaction, which is June 9, 2006; or
>
> 2.     the date you receive your Truth-in-Lending disclosures; or

---

[4]     The portions of Ms. Knyazhesky's deposition transcript cited herein are collectively attached hereto as Exhibit C.

> 3.       the date you receive this notice of your right to
> cancel.

(Exh. D) (emphasis added).

Further down the page, the Notices stated: "if you cancel by mail or telegram, you must send the Notice no later than midnight of June 12, 2006 (or midnight of the third business day following the latest of the three events listed above)." (*Id.*) (parentheses in original).  Because TILA excludes Sundays from its calculation of business days, June 12, 2006 was technically not three business days after June 9, 2006 for purposes of TILA.  Therefore, out of an abundance of caution, new Notices of Right to Cancel were sent to Plaintiffs shortly after Plaintiffs' loan closed.  (J. Greives Dep. p. 43).  These new Notices – dated June 16, 2006 – were identical in all respects to the original Notices, except that the new Notices provided: "you must send the notice no later than midnight of June 20, 2006 (or midnight of the third business day following the latest of the three events listed above)."  (Notices of Right to Cancel, dated 6/16/06, Nulman Dep. Exh. 4, attached hereto as Exh. E).  There is no dispute that, under TILA, June 20, 2006 was three business days after the June 16, 2006 date of the Notices.  At deposition, Plaintiffs admitted that their signatures appear on these new Notices, but Plaintiffs nevertheless denied that they received them following the loan closing.  (Nulman Dep. pp. 62-64; Knyazhesky Dep. pp. 24-25).

Plaintiffs did admit at deposition that, prior to the loan closing, they did not communicate with anyone from Countrywide.  (Nulman Dep. pp. 54-55; Knyazhesky Dep. p. 18).  Following the loan closing, MW sold Plaintiffs' loan to Countrywide.  (N. Butala Aff., attached hereto as Exh. F).

## III.   ARGUMENT

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  According to the United States Supreme Court, a court on a motion for summary judgment can decide that the evidence "is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).  In addition, Rule 56 of the Federal Rules does not allow a party opposing summary judgment to rely merely upon bare assertions, conclusory allegations, or mere suspicions.  *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir.1982); *see also Nieves v. Hess Oil Virgin Islands Corp.*, 819 F.2d 1237, 1252 (3d Cir.1987) (stating that "unsupported allegations and assertions do not prevent summary judgment").

### A.   **Plaintiffs' TILA Claim Fails As A Matter Of Law On Multiple Grounds**

In Count I, Plaintiffs assert a claim for TILA rescission based on the reference to the June 12, 2006 deadline in the original Notices of Right to Cancel that MW provided to Plaintiffs at the loan closing.  This claim fails as a matter of law as against Countrywide for multiple reasons.

#### 1.   **The TILA Claim Is Time-Barred**

Plaintiff's claim under TILA is for rescission of their loan.  (Sec. Am. Compl. ¶¶ 16-27).  Pursuant to section 1635(f) of TILA, a debtor has a continuing right to rescind a transaction where the creditor violates the disclosure provisions of the statute.  This right, however, *"shall expire three years after the date of consummation of the*

*transaction* or upon the sale of the property, whichever occurs first, notwithstanding the fact that the information and forms required under this part have not been delivered to the obligor." 15 U.S.C. § 1635(f) (emphasis added).

Here, plaintiffs entered into the subject loan on June 9, 2006 (Sec. Am. Compl. ¶ 10), and did not file their second amended complaint asserting claims against Countrywide until May 25, 2010, which is beyond the three-year period under Section 1635(f). Accordingly, plaintiffs' TILA claim against Countrywide is barred under Section 1635(f).

Plaintiffs undoubtedly will attempt to invoke the "relation-back" doctrine under Federal Rule of Civil Procedure 15, arguing that the TILA claim against Countrywide should be treated as if it was filed as of the commencement of this action. The Supreme Court has held that the time limitation under Section 1635(f) is an absolute requirement that is *not* subject to tolling for any purpose whatsoever. *Beach v. Ocwen Federal Bank*, 523 U.S. 410 (1998). This Court has applied the holding of *Beach* in numerous cases. *See, e.g.*, *Lavelle v. M&T Mort. Corp.*, No. 05-2144, 2006 WL 2346320, at *2 (E.D. Pa. Aug. 11, 2006) ("While the statute of limitations may be equitably tolled, the limitation of the right to rescind is definitive and finite – section 1635(f) operates as a statute of repose so that the right to rescind unequivocally expires on the date three years after the transaction occurs."); *Ocasio v. Ocwen Loan Servicing, LLC*, 2008 U.S. Dist. LEXIS 56289, at *7 (E.D. Pa. Jul. 23, 2008) ("In *Beach v. Ocwen Federal Bank*, the Court unequivocally determined that the three-year period [under Section 1635(f)] is not a statute of limitations, which refers to the time period for bringing a lawsuit, but is instead a statute of repose, which circumscribes the absolute

expiration of the right itself."). *Accord Kemezis v. Matthew*, 2008 U.S. Dist. LEXIS

47330, at **9-10 (E.D. Pa. Jun. 18, 2008); *Morilus v. Countrywide Home Loans, Inc.*,

651 F. Supp. 2d 292, 304 (E.D. Pa. 2008).

      In fact, the time bar of section 1635(f) has been held to go to the federal

court's subject matter jurisdiction: "When congressionally-created limitations on

congressionally-created public rights and benefits completely extinguish the right

previously created, courts are deprived of jurisdiction." *Miguel v. Country Funding

Corp.*, 309 F.3d 1161, 1165 (9th Cir. 2002).

      Given the nature of Section 1635(f), courts have specifically and

uniformly held that the relation back doctrine of Federal Rule of Civil Procedure 15(c)

may not be invoked to add a party whose TILA rescission claim otherwise would be

barred by Section 1635(f)'s three-year period.  In *Miguel*, for example, the Ninth Circuit

explained:

> Rule 15(c) may not be used to extend federal jurisdiction.
> The Federal Rules of Civil Procedure may not "abridge,
> enlarge or modify any substantive right."  28 U.S.C.
> § 2072(b).  *See also USM Corp v. GKN Fasteners Ltd.*, 578
> F.2d 21, 22 (1st Cir. 1978) (holding that "Rule 15 is not to
> be viewed as enlarging or restricting federal jurisdiction.
> The doctrine of relating back in time to the original
> pleadings does not affect the jurisdiction of the court here
> in any manner.") (citation and footnote omitted); Fed. R.
> Civ. P. 82 ("[The Federal Rules of Civil Procedure] shall
> not be construed to extend or limit the jurisdiction of the
> United States district courts. . . .").

309 F.3d at 1165.  Other courts, including courts within this Circuit, have reached the

same conclusion.  *See, e.g.*, *In re: Community Bank of Northern Virginia & Guaranty

Bank Second Mortgage Litig.*, 467 F. Supp. 2d 466, 482 (W.D. Pa. 2006) ("Regardless of

whether the three year limitation under Section 1635(f) is styled as jurisdictional, or as

simply creating a substantive right not subject to tolling, it is clear that, upon the

expiration of three years, the right of rescission is extinguished and cannot be revived

through any procedural mechanism," such as Rule 15(c)); *In re Meyer*, 379 B.R. 529, 541

(Bankr. E.D. Pa. 2007) ("Here, the application of Rule 15(c)'s relation back provision to

add a defendant would resurrect jurisdiction over an extinguished [TILA rescission]

claim. . . . Just so, this Court lacks jurisdiction over Deutsche now that the three-year

rescission period has expired. Accordingly, to the extent that the amendment seeks to

add Deutsche as a defendant, leave will be denied."); *Harris v. OSI Financial Servs., Inc.*,

595 F. Supp. 2d 885, 898 (N.D. Ill. 2009) ("since the statutory period, enumerated in

Section 1635, for borrowers to elect a rescission is a statute of repose, Plaintiffs may not

rely on the relation back doctrine or on any other equitable extension."). The identical

reasoning requires the Court to reject plaintiffs' relation back argument in the instant

case.[5]

---

[5]    Notably, the fact that Plaintiffs may have filed a timely action seeking rescission against Countrywide Home Loans, Inc., the servicer of the loan at issue here, is insufficient. As a matter of law, notice of the exercise of the right to rescind sent to the loan servicer does *not* constitute notice to the actual holder of the loan. The Ninth Circuit dealt with this precise issue in *Miguel*. There, the Ninth Circuit specifically rejected the argument that service of the notice of cancellation upon the loan servicer, Countrywide Funding Corporation, was sufficient to provide notice to the loan holder, Bank of New York (the "Bank"): "While the Bank's servicing agent, Countrywide [Funding Corporation], received notice of cancellation within the relevant three-year period, *no authority supports the proposition that notice to Countrywide [Funding Corporation] should suffice for notice to the Bank. Therefore, her right to cancellation was extinguished as against the Bank.* When congressionally-created public rights and benefits completely extinguish the right previously created, courts are deprived of jurisdiction." 309 F.3d at 1165 (emphasis added).

2.   **The TILA Claim Also Fails Because The Notices Of Right To Cancel Did In Fact Clearly And Conspicuously Disclose The Rescission Date**

As noted above, Plaintiffs' TILA claim is predicated entirely upon the allegation that the Notices of Right to Cancel that Plaintiffs admit they received at the loan closing stated that Plaintiffs had only until June 12, 2006 to cancel, which was less than the requisite three business days.  (Sec. Am. Compl. ¶¶ 10, 19-24).  Plaintiffs' contention is inaccurate and, in fact, the Notices fully complied with TILA.

The Notices, which are quoted in relevant part above, are based upon and contain language identical to Federal Reserve Board Model Form H-8.  Federal Reserve Board Model Form H-8, in turn, is consistent with the time limits for rescission as set forth in 15 U.S.C. § 1635(a).  Section 1635(a) provides, in relevant part, as follows:

> [T]he obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction *or the delivery of the information and rescission forms required* under this section together with a statement containing the material disclosures required under the title [15 USCS §§ 1601 et seq.], *whichever is later . . .*

15 U.S.C. § 1635(a) (emphasis added).

As Plaintiffs admittedly received the Notices, and the Notices provided that Plaintiffs had "three business days" from June 9, 2006 to cancel the transaction, the Notices complied with TILA.

Plaintiffs nevertheless try to premise their claim upon the fact that, further down the page, the Notices stated: "if you cancel by mail or telegram, you must send the Notice no later than midnight of June 12, 2006 (or midnight of the third business day following the latest of the three events listed above)."  (Exh. D hereto) (parentheses in original).  Plaintiffs contend that the Notices were deficient because, under TILA, June

12, 2006 was not three business days after June 9, 2006.  Although that is strictly true,

Plaintiffs' argument fatally ignores the language immediately following the June 12 date

which provides for cancellation no later than "midnight of the third business day

following the latest of the three events listed above."  Obviously, one of the three listed

events was June 9, 2006, the date on which Plaintiffs admittedly received the Notices.

The First Circuit dealt with this precise situation in *Palmer v. Champion*

*Mortgage*, 465 F.3d 24 (1st Cir. 2006).  There, the borrower received the Notices after the

specific date the Notices provided for cancellation.  The First Circuit nevertheless

concluded that the Notices at issue fully complied with TILA, explaining – in words

equally applicable to the present case – as follows:

> It clearly and conspicuously indicates that the debtor can
> rescind "within three (3) business days from whichever of
> [three enumerated] events occurs last."  Although the
> Notice does state in part that rescission has to occur "no
> later than midnight of APRIL 1, 2003," the plaintiff wrests
> this statement from its contextual moorings.  The statement
> is followed immediately by a parenthetical reading "(or
> midnight of the third business day following the latest of
> the three (3) events listed above)."  We fail to see how any
> reasonably alert person-that is, the average consumer-
> reading the Notice would be drawn to the April 1 deadline
> without also grasping the twice-repeated alternative
> deadlines.

465 F.3d at 28-29.

Courts outside of the First Circuit have followed *Palmer* in identical

circumstances.  For example, the court in *Simmons v. Mortgage Electronic Registration*

*Sys., Inc.*, 2010 U.S. Dist. LEXIS 8713 (D. Minn. Feb. 2, 2010), recently rejected an

argument identical to that made by the borrower in *Palmer* (and by Plaintiffs here),

reasoning as follows:

> The [Notice of Right to Rescind] plainly provides that the
> Simmonses had the right to cancel "within three business
> days from whichever of [three enumerated events] occur[s]
> last." Later, as the Simmonses observe, the notice indicates
> that they had to send their cancellation by midnight on
> March 28, 2006,  The Simmonses, however, fail to
> acknowledge the parenthetical that immediately follows the
> March 28 deadline: "(or midnight of the third business day
> following the latest of the Three events listed above)." The
> notice plainly discloses alternative deadlines.  An
> objectively reasonable reading of the notice reveals that the
> contradiction perceived by the Simmonses does not
> exist. . . .  Accordingly, the Court rejects the Simmonses'
> argument that the notice failed to clearly and conspicuously
> disclose the date their rescission period expired."

*Id.* at **12-13 (citing *Palmer*, 465 F.3d at 29).  *Accord Ware v. Indymac Bank, FSB*, 534

F. Supp.2d 835, 844-45 (N.D. Ill. 2008); *McMillian v. AMC Mortgage Servs., Inc.*, 560 F.

Supp.2d 1210, 1219 (S.D. Ala. 2008).  *See also Melfi v. WMC Mortgage Corp.*, 568 F.3d

309 (1st Cir. 2009) (reaffirming rationale of *Palmer*, and extending it to hold that Notice

of Right to Cancel complied with TILA even though Notice left blank spaces for the date

of the transaction and the deadline to rescind).

     For this reason as well, Plaintiffs' TILA claim fails as a matter of law.

    **3.**    **In Any Event, The Purported Defect In The Original Notices
Of Right To Cancel Was Cured By The Issuance Of The New
Notices Of Right To Cancel**

    As explained above, new Notices of Right to Cancel were sent to Plaintiffs

shortly after the loan closing that indisputably complied with TILA.  These new Notices

cured the defect that Plaintiffs claim existed in the original Notices, and, in fact, extended

the time within which Plaintiffs had to cancel their loan.

    Despite having admitted at deposition that their signatures appear on the

"Acknowledgment of Receipt" lines of these new Notices, Plaintiffs contend that they

never received them.  Under 15 U.S.C. § 1635(c), "written acknowledgment of receipt of

any disclosures under [TILA] create[s] a rebuttable presumption of delivery thereof." In addition, as the Third Circuit Court of Appeals just weeks ago held: "Where a borrower's testimony is self-serving and unreliable, such testimony has been found insufficient to rebut a presumption of delivery" under TILA. *Jobe v. Argent Mortgage Co., LLC*, 2010 U.S. App. LEXIS 6961, at *4 (3d Cir. Apr. 2, 2010). *Accord Strang v. Wells Fargo, N.A.*, 2005 U.S. Dist. LEXIS 14135, at * 10 (E.D. Pa. July 13, 2005) ("a borrower's testimony that [TILA] disclosures were not provided, without more, is insufficient to rebut the presumption that disclosure occurred where there is written acknowledgement of receipt"), *aff'd*, 266 Fed. Appx. 108 (3d Cir. Feb. 20, 2008); *Oscar v. Bank One, N.A.*, 2006 WL. 401853, at *3 (E.D. Pa. Feb. 17, 2006) ("Plaintiffs' execution of the Federal Truth in Lending Disclosure Statement creates a presumption that those disclosures were, in fact received and Alvin Oscar's statement to the contrary is not, by itself, sufficient to rebut that presumption").

Thus, here, Plaintiffs' signed acknowledgments of receipt of the new Notices create a presumption that Plaintiffs received them, and Plaintiffs' own self-serving testimony that they did *not* receive them is insufficient to rebut the presumption.

Accordingly, Plaintiffs' TILA claim additionally fails as a matter of law based on the new Notices they were sent.

## B.    Plaintiffs' UTPCPL Claim Fails As A Matter Of Law

In Count II, Plaintiffs assert a claim under the UTPCPL against both MW and Countrywide. In support of this claim, Plaintiffs allege that MW and Countrywide knew that Plaintiffs qualified for a more favorable loan than the one they actually

received, but falsely represented to plaintiffs that the loan they received was the best one available to them.  (Sec. Am. Compl. ¶ 30).[6]

Plaintiffs' UTPCPL claim appears to be based on the UTPCPL "catch-all" provision, which prohibits a defendant from "engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  73 P.S. § 202-2(4)(xxi).  The Pennsylvania Superior Court has held that:  "In order to establish a violation of this catchall provision, 'a Plaintiffs must prove all of the elements of common-law fraud.'"  *Colaizzi v. Beck*, 895 A.2d 36, 39 (Pa. Super. 2006) (quoting *Sewak v. Lockhart*, 699 A.2d 755, 761 (Pa. Super. 1997)).  "In turn, to establish common-law fraud, a Plaintiffs must prove," among other elements, a "misrepresentation of a material fact."  *Colaizzi*, 895 A.2d at 39.  In addition, as the Third Circuit Court of Appeals recently confirmed, a claim under the UTPCPL catch-all provision also requires proof of justifiable reliance.  *Hunt v. United States Tobacco Co.*, 538 F.3d 217, 224 (3d Cir. 2008) ("we conclude that private Plaintiffs alleging deceptive conduct under [the UTPCPL's] post 1996 catchall provision must allege justifiable reliance.").

Here, there is no evidence that anyone from Countrywide ever even communicated with Plaintiffs prior to their loan closing.  Indeed, Plaintiffs admitted at deposition that they never communicated with anyone from Countrywide at any time prior to the closing on their loan. (G. Nulman Dep. pp. 54-55; T. Knyazhesky Dep. p. 18).  Instead, Plaintiffs testified at deposition that they communicated exclusively with MW

---

[6]     Plaintiffs also allege that MW falsely represented the features of the loan that plaintiffs received, including the monthly payment and amortizations of the loan principal.  (Sec. Am. Compl. ¶ 30).  This allegation, however, appears to be directed solely at MW, and not at Countrywide.  In any event, there is no evidence in the record that Countrywide made any such false representations.

about the loan prior to its closing, and that it was MW's representative – not anyone from Countrywide – who told Plaintiffs that MW could get them the best possible loan.  (*Id.*). It is well-settled that an assignee of a loan (here, Countrywide) cannot be held liable under the UTPCPL for any alleged misrepresentation or conduct by the assignor (here, MW).  *See e.g., Colanzi v. Countrywide Home Loans, Inc.*, No. 07-3637, 2008 WL 483446, at *2 (E.D. Pa. Feb. 22, 2008) ("[A]ssignees of loans, who have not themselves committed any wrongdoing, cannot be held liable under the UTPCPL.").  *Accord McMaster v. CIT Group/Consumer Fin., Inc.*, No. 04-0339, 2006 WL 1314379, at *11 (E.D. Pa. May 11, 2006); *Canty v. Equicredit Corp. of Am.*, No. 01-5804, 2003 WL 21243268, at *3 (E.D. Pa. May 8, 2003).

In the absence of any communication by Countrywide with Plaintiffs prior to the loan closing, Countrywide could not have made the alleged misrepresentations at issue to Plaintiffs.  Moreover, in the absence of any misrepresentation by Countrywide, Plaintiffs obviously could not have justifiably relied on any such misrepresentation.  Thus, the UTPCPL claim fails as a matter of law as against Countrywide.

Even if Countrywide somehow could be held responsible for MW's alleged misrepresentations (which, as explained above, Countrywide cannot be), Plaintiffs' claim still would fail as a matter of a law based on the parol evidence rule.  Simply put, parol evidence is not admissible to vary, add to or contradict the terms of a written contract intended to be the final integration of the agreement between the parties.  *Gemini Equipment Co. v. Pennsy Supply, Inc.*, 595 A.2d 1211, 1215 (Pa. Super. 1991).  This rule applies to a fully integrated writing regardless of whether the contract contains a clause stating that it is fully integrated.  *See id.* (evidence of alleged prior oral

representations barred by the parol evidence rule because, even though contract contained

no integration clause, contract was complete as to the subjects of the representations);

*Henry v. First Federal Savings & Loan Ass'n of Greene County*, 313 Pa. Super. 128, 136,

459 A.2d 772, 776 (1983) (same).

The Third Circuit addressed the parol evidence rule in *Dayhoff Inc. v. H.J.

Heinz Co.*, 86 F.3d 1287 (3d Cir. 1996).  Much like Plaintiffs here, the *Dayhoff* plaintiff

argued that it was induced to enter into a distribution contract by the defendant's false

and misleading statements regarding the scope and purpose of the contract's termination

provision.  *Id.* at 1299.  The Third Circuit prohibited the plaintiff from introducing

allegations of oral representations contrary to express terms of the agreement on the basis

that:

> the parol evidence rule barred consideration of prior
> representations concerning matters covered in the written
> contract, …. Otherwise, the parol evidence rule 'would
> become a mockery,' and integrated contracts could be
> avoided or modified by claims of differing prior
> representations.

*Id.* at 1300 (citing *HCB Contractors v. Liberty Place Hotel Assocs.*, 539 Pa. 395, 652

A.2d 1278, 1279 (1995)).

Chief Judge Bartle of the Eastern District of Pennsylvania recently held

that the parol evidence rule barred a borrower from introducing evidence of alleged

misrepresentations made by Countrywide.  *Devine v. America's Wholesale Lender*, 2008

WL 4367489 (E.D. Pa. Sept. 25, 2008).  In *Devine*, the plaintiffs alleged that

Countrywide violated the UTPCPL by, *inter alia*, failing to provide the mortgage product

promised and failing to inform them that their loan would be structured as two loans.  *Id.*

at *4.  The *Devine* Court held that, because the loan documents plaintiffs signed

constituted the entire agreement between the parties and covered the subjects of the

alleged misrepresentations, the parol evidence rule prohibited introduction of the alleged

misrepresentations and, thus, plaintiffs could not prove the elements of a UTPCPL claim.

*Id.* at *5.  *See also Garczynski v. Countrywide Home Loans, Inc.*, 656 F. Supp.2d 505,

512 n.5 (E.D. Pa. 2009) (noting that mortgage broker's alleged misrepresentations that

formed basis for UTPCPL claim arising out of loan made by Countrywide "are

presumptively inadmissible under the parol evidence rule because Plaintiffs' written

contract with Countrywide purports to represent the entire agreement between the

parties").

Here, as in *Devine*, the loan documents constitute the final, integrated,

unambiguous expression of the obligations between Plaintiffs and MW.  Accordingly,

admission of any prior alleged misrepresentations is barred by the parol evidence rule.

Finally, it should further be emphasized that Countrywide did not play a

part in selecting the particular loan that Plaintiffs received, and about which they are now

complaining.  As explained above, CLOUT allowed MW to determine Plaintiffs'

eligibility for *any* type of loan, but MW chose to seek Plaintiffs' eligibility *only* for the

ARM that Plaintiffs ultimately received.  For that reason as well, Countrywide should not

be held responsible for MW's alleged conduct.

## IV.    CONCLUSION

For the foregoing reasons, Countrywide respectfully requests that the

Court grant this Motion for Summary Judgment, and dismiss Plaintiffs' Complaint

against Countrywide with prejudice.

/s/ Joel E. Tasca
Martin C. Bryce, Jr., Esquire
Joel E. Tasca, Esquire
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103-7599
Telephone: 215.864.8238/8188
Facsimile: 215.864.8999
bryce@ballardspahr.com
tasca@ballardspahr.com

*Attorneys for Defendant
Countrywide Bank, FSB*

Dated:  June 8, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of June, 2010, I have caused a true and correct copy of the foregoing Motion of Defendant Countrywide Bank, FSB for Summary Judgment, with supporting memorandum of law, to be served on the following counsel via ECF, and such documents are available for viewing and downloading from the ECF system:

Robert P. Cocco, Esquire
ROBERT P. COCCO, P.C.
1500 Walnut Street
Suite 900
Philadelphia, PA  19103

Matthew B. Weisberg, Esquire
PROCHNIAK WEISBERG, P.C.
7 South Morton Avenue
Morton, PA  19070

*Attorneys for Plaintiffs*

Richard J. Weitzman, Esquire
LAW OFFICES OF RICHARD J. WEITZMAN, P.C.
3 North Second Street
Suite 200
Philadelphia, PA  19106

*Attorneys for Defendant*
*Money Warehouse, Inc.*

/s/ *Joel E. Tasca*
Joel E. Tasca

# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CIVIL ACTION NO. 09-1503

\* \* \*

ORIGINAL

GREG NULMAN and TATYANNA
KNYAZHESKY,

      Plaintiffs,

   vs.

MONEY WAREHOUSE, INC. and
COUNTRYWIDE HOME LOANS, INC,

    Defendants.

\* \* \*
March 1, 2010
\* \* \*

      Oral sworn deposition of GREGORY
NULMAN, held at the law offices of Ballard
Spahr, LLP, 1735 Market Street, 51st Floor,
Philadelphia, Pennsylvania, commencing at
1:00 P.M. before Sharon L. Martin, a
Federally Approved, Registered Professional
Reporter, Certified Court Reporter-NJ, Notary
Public.

\* \* \*



ROYAL
COURT REPORTING

1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

1    the Settlement Statement on the 2006 loan

2    that you got about $100,000, maybe slightly

3    more than that in cash from the loan

4    proceeds; does that sound about right?

5    A.    I don't remember.

6    Q.    Do you have any reason to believe you

7    didn't get about $100,000 in cash from loan

8    proceeds?

9    A.    No, I didn't ask about money, any cash.

10   I didn't need -- did not need it, any money,

11   cash.

12          MR. WEISBERG:  He's asking you

13   did you receive $100,000 or so as a result of

14   this re-fi?

15          THE WITNESS:  Yes, and this is

16   going -- going to put on the second property.

17   BY MR. TASCA:

18   Q.    So that's what you used it as a down

19   payment on the second property --

20   A.    That's right.

21   Q.    -- on Bustleton Avenue?

22          Wait until I finish my question.

23          What led you to go to the Money

24   Warehouse for the loan you got in 2006?



ROYAL
COURT REPORTING

1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

1   A.    What...

2   Q.    Why did you go to the Money Warehouse

3   when you refinanced in 2006?

4   A.    Somebody, somebody just give me advice

5   that they do good job.

6   Q.    I'm sorry.

7   A.    Yes.  And I called and one person

8   was -- pick up the phone.  Told me, okay,

9   come over, we're going to help you.

10  Q.    It was a friend who gave you this

11  advice?

12  A.    Some -- I don't know.  Several -- it's

13  not.  I don't remember even who.  But I just

14  got -- I just got the phone number, I

15  remember I got phone number from newspaper.

16  Somebody told me about this agency and I got

17  the number from newspaper and I called them.

18  Q.    And you had never -- you had never had

19  any experience with the Money Warehouse

20  before you called?

21  A.    Never.

22         MR. WEISBERG:  Let me go to the

23  bathroom.  Can I interrupt that question?

24         Or why don't you answer the



1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

1    question.

2                    MR. TASCA:   I think he did.

3                    (Brief recess)

4    BY MR. TASCA:

5    Q.    Before we broke, Mr. Nulman, I had

6    asked you how you had heard of the Money

7    Warehouse and you explained that to me.

8             When did you first go to the Money

9    Warehouse?

10   A.    I can't remember exactly period of

11   this, but it was couple months before

12   settlement.   It was -- I find number,

13   telephone number in Russian newspaper.   And I

14   was looking special for people who speak

15   Russian, because it is -- legal document for

16   me, it's difficult.   Engineering Guy, I

17   reading, drafting, calculating, it's numbers.

18   Actually, engineering, I'm okay.   It's good

19   enough for job.   And that was my purpose,

20   what I looking for Russian.   And agent was --

21   I come to agent, maybe even settlement was in

22   June or --

23   Q.    June 2006?

24   A.    June.   Probably it was maybe April, two


ROYAL
COURT REPORTING

1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

Page 38

1    or three months before.

2        Q.    And the sequence was that you called

3    and then you went to the office?

4        A.    Yes.

5        Q.    How many times did you go to the office

6    of Money Warehouse?

7        A.    Maybe three, maybe four times, just for

8    sign the paperwork.  He told me, Greg, Come

9    over.  He called me.  Told me, Greg, come

10   over, you need sign paper.

11           I come over and sign.

12               MR. WEISBERG:  You're talking,

13   asking before the closing?

14               THE WITNESS:  Yes, before

15   closing.

16               MR. TASCA:  Yes, before the

17   closing, right.

18               THE WITNESS:  Right.

19   BY MR. TASCA:

20       Q.    By the way, Mr. Nulman, do you read any

21   English newspapers?

22       A.    Yes.

23       Q.    Which ones?

24       A.    Philadelphia Inquirers I like, Time



1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

1  Magazine and not so much.

2      Q.    Do you have subscriptions to those --

3  to the Philadelphia Inquirer?

4      A.    No.   Years ago we have a subscription,

5  but in last several years we just bought or

6  some -- sometimes it's free edition, like

7  something like that.   Yeah.   Generally, I'm

8  not so much reader of newspaper in English.

9  Actually, I'm not read books in English, I

10  read books in Russian.

11     Q.    Do you -- strike that.

12         You said that you do read Time

13  Magazine?

14     A.    Yes, yes.   Sometimes we have a

15  prescribed [sic] several years for Time

16  Magazine.

17     Q.    You had a subscription for Time

18  Magazine?

19     A.    Yes.   Subscription, yes.   It's actually

20  political news, it's easy to understand.

21  It's -- they have a picture -- I mean,

22  photograph, it's easy to understand and I

23  love this.   They -- since -- CBC since -- and

24  this magazine, it's very close and I love to



ROYAL
COURT REPORTING

1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

1    a ventilator in this period.

2          And he told me, Don't worry about.

3    After this -- after settlement you anytime

4    can bring your wife this day or next day to

5    my office and you -- and she sign after you.

6    Q.    So she signed the documents after --

7    A.    Yes.

8    Q.    -- after you signed them?

9    A.    Yes.

10   Q.    How many days after?

11   A.    Same day.

12   Q.    Oh, same day?

13   A.    Same day.

14   Q.    She came later that day and signed the

15   documents?

16   A.    She not came.  We came together.  I

17   came -- come home and she come home after

18   from hospital and we together come to the

19   Money Warehouse.  So lady nothing --

20   nothing --

21   Q.    Not the title agent's office?

22   A.    No, Money Warehouse.  And this was one

23   single time when my wife was in Money

24   Warehouse.



ROYAL
COURT REPORTING

1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

Page 53

1    Q.    Okay.  So let me just state this back

2  and you can tell me if I have it right.

3         You -- you went to the title agent's

4  office by yourself and you signed the

5  documents, then you went home and you and

6  your wife went back to the Money Warehouse's

7  office and that's when your wife signed the

8  loan documents?

9    A.    Right.

10   Q.    And that all took place in one day?

11   A.    Right, one day, same day.

12   Q.    At the closing that you attended by

13 yourself when you signed the loan documents,

14 was Mr. Rakita there?

15   A.    Yes.

16   Q.    And there was someone from the title

17 agency there as well?

18   A.    No.

19   Q.    Was her name Mary?

20   A.    Don't remember.

21   Q.    Was anyone else there?

22   A.    Lawyer, lawyer, it was lawyer there.

23   Q.    Lawyer for whom?

24   A.    I don't know.



ROYAL
COURT REPORTING

1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

Page 54

1    Q.    It wasn't your lawyer?

2    A.    No, no, I not hire lawyers.

3    Q.    Okay.

4    A.    It was lawyer there and this person all

5    the time talking some jokes.

6    Q.    Tell jokes?

7    A.    (Witness nods head).

8    Q.    What was the lawyer's name?

9    A.    I don't remember.

10   Q.    Do you have any sense of what the

11   lawyer was doing there?

12   A.    No.  I was explain, I don't remember

13   from whom, but I remember I was explained

14   from some that lawyers -- lawyer is here

15   because he supposed to be check is every

16   paper right.  That's it.

17   Q.    At the loan closing there was no one

18   from Countrywide there, correct?

19   A.    No.

20   Q.    At any time prior to the loan closing

21   did you ever communicate with anyone from

22   Countrywide?

23   A.    No.  Even I don't know it's Countrywide

24   my bank, because nobody told me about.  I



1    find out Countrywide when I get the first

2    statement and pay, first bill.

3    Q.    I'm going to show you what we marked as

4    Exhibits Nulman-2 and Nulman-3.

5        Were these two of the documents that

6    you signed at the loan closing?

7    A.    I don't remember.

8    Q.    Can you take a look to see if your

9    signature appears on these documents,

10   Exhibits Nulman-2 and 3?

11   A.    This not signature.  Here, just

12   initial.

13   Q.    Right.

14       But if you page --

15       MR. TASCA:  For the record, the

16   Witness is looking at Nulman-2.

17   BY MR. TASCA:

18   Q.    If you page to the back of that

19   document, let me know if you see your

20   signature.

21   A.    Yes, it looks like my signature.

22   Number two.

23   Q.    And look at Exhibit Nulman-3 and let me

24   know the same thing, if that's your



1    signature.

2    A.    It looks -- I'm not sure.  It looks

3    mine.

4    Q.    Do you have any reason to doubt that

5    that's your signature?

6    A.    No.  Why?  It looks mine.  It was 9 --

7    June 9th, it was the date, settlement day.

8    Q.    Now, did you --

9    A.    I don't know what stems -- but it's not

10    my -- I not write the date.  Yeah, but

11    I trust -- I believe it's the same date.

12    Q.    Right.

13              MR. TASCA:  And, for the

14    record, the Witness was indicating toward the

15    stamped date that appears on Exhibit

16    Nulman-3.

17    BY MR. TASCA:

18    Q.    But the handwritten signature, you have

19    no reason to doubt that that's your

20    signature, correct?

21    A.    It looks my signature.

22    Q.    Now, you mentioned before that you

23    didn't read the documents before you signed

24    them.  Would that apply to these documents as



ROYAL
COURT REPORTING

1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

Page 61

1    Q.    Mr. Nulman, after the closing on

2    June 9, 2006, did you receive some additional

3    documents a few days later?

4    A.    No.  No, I don't remember anything.  I

5    just -- after closing I come home.  And after

6    my wife come back from hospital, we go to

7    Money Warehouse.  And there some lady wait

8    for us.  And Mr. Rakita was not there.  Some

9    lady wait for us.  And she has a -- like,

10   pile of documents.  And we sit in a desk.

11   And she just give one by one to my wife and

12   told sign, sign this, sign this, sign this,

13   sign this.

14        And she sign everything and we left.

15   Q.    This was later that day on June 9th?

16   A.    It was same day, it was same day after,

17   that's it.

18   Q.    Okay.

19   A.    I never, I never was after then in

20   Money Warehouse and my wife was just the one

21   time of this in Money Warehouse.

22   Q.    Did -- did you receive any documents in

23   the mail in connection with your loan that

24   you signed, maybe a week after?



ROYAL
COURT REPORTING

1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

1    A.    For sign?

2    Q.    For signature.

3    A.    That's a no.  I don't remember.

4              MR. TASCA:  Let's mark this

5    document.

6              (Exhibit Nulman-4, Notice of

7    Right to Cancel, is marked for

8    identification)

9    BY MR. TASCA:

10   Q.    Mr. Nulman, I've handed you what I've

11   marked as Exhibit Nulman-4.  And you'll see

12   that it says --

13   A.    Very similar.  I think it's the same.

14   No, it's different.

15   Q.    It's different.  Right.

16   A.    Okay.

17   Q.    Exhibit Nulman 4 says Notice of Right

18   to Cancel on top.

19   A.    Okay, mm-hum.

20   Q.    And you'll see that there's a date at

21   the bottom that says June 16, 2006?

22   A.    No, I -- I never -- I told you, my last

23   time when I have -- when I were in the Money

24   Warehouse, it was same day, I -- when I came



Page 63

1    together with my wife.  Never late.  Never

2    after, never.  And last time I talk with some

3    person from them, it was Mike, when I call

4    after two, three months when I find out what

5    is problem, I call, that's it.

6          And he told me, We can't do anything

7    for you.  You have a mortgage and you have to

8    pay for.

9          Done, that's it.  Never after.

10   Q.    Did you receive anything in the mail

11   from Countrywide, maybe a week after the loan

12   closing, such as this Notice of Right to

13   Cancel that we've marked as Exhibit 4?

14   A.    I don't remember, but probably we

15   receive some payment bills or some -- like a

16   statement for -- for payment.  It should be.

17   Q.    Mr. Nulman, is it possible that you

18   received this Notice of Right to Cancel in

19   the mail about a week after your loan closing

20   and signed it and returned it but you just

21   don't remember now?

22   A.    No, we not -- we not receive anything

23   from them.  That's a for sure.  Not -- not in

24   the paper and not in the office, that's a for



1    sure.  Last our connection, I don't know,

2    connection, for sign, it was same day,

3    evening.

4        Q.    Could you look at the signature that

5    appears --

6        A.    I see it, it looks my signature.

7        Q.    Let me finish my question, sir.

8        A.    I'm sorry.

9        Q.    If you look at the signature there on

10   Exhibit 4, does that appear to be your

11   signature?

12       A.    It looks my signature, but it's date,

13   different date.  It's seven days after.  I

14   don't know how they can -- yeah, probably

15   stamps, just a stamp, different stamp.  I

16   never -- I never was there after this day,

17   after second -- I never was there.

18       Q.    But did you receive anything in the

19   mail?

20       A.    I -- we don't receive anything from

21   them, because it was done.  By -- when my

22   wife sign, I sign during the settlement, my

23   wife sign in the evening and it was done,

24   that's it.  We never received anything, we



ROYAL
COURT REPORTING

1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

Page 65

1    never sign anything.  Just after I pay the

2    bills.  And a third, four -- four, I forgot

3    right now was problems [sic].

4        Q.    Now, earlier in the deposition there

5    were some facts about the transaction that

6    you couldn't remember, because it was three

7    and-a-half years ago, correct?

8        A.    Sometimes you don't remember what's

9    yesterday happen.

10       Q.    And -- and given that, that sometimes

11   you don't remember what happened yesterday,

12   isn't it possible that you received this

13   Notice of Right to Cancel three and-a-half

14   years ago that we marked as Exhibit 4 and

15   signed it, but just don't remember now?

16       A.    No, I remember very clearly.  I know --

17   I'm not -- I'm not remember or not remember.

18   I know for sure, just I know.  Our last

19   connection or talking about this house or

20   purchases, refinancial, it was same day,

21   never after, never.  After I receive only

22   bills.  It's never happened after.  This is

23   for sure.

24       Q.    Okay.  I don't have anything further.



# EXHIBIT B

IN THE UNITES STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NULMAN, et al.,                    :
                                   :   Civil Action
       Plaintiffs,                 :
                                   :
   - vs -                          :
                                   :
MONEY WAREHOUSE, INC.;             :
COUNTRYWIDE HOME                   :
LOANS, INC.                        :
                                   :
       Defendants.                 :   NO. 09-1503


       Oral deposition of JAMES GREIVES,

taken at BALLARD SPAHR, LLP, 1735 Market Street,

51st Floor, Philadelphia, Pennsylvania, taken on

Thursday, February 18, 2010, beginning at

approximately 1:00 p.m., before Donna M. Ray,

Registered Professional Reporter, Certified Court

Reporter and Notary Public in and of the

Commonwealth of Pennsylvania.


SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

JAMES GREIVES

1      Q.   Are you under any medication or any other

2   substances that would impair your ability to

3   testify here today truthfully, accurately and

4   fully?

5      A.   No, I'm not.

6      Q.   You're doing an excellent job.  So

7   continue to wait until I ask my question before you

8   answer, and I'll wait until you answer before I ask

9   my next question so the court reporter can keep the

10   record clean.

11          If you need to stop at any time to

12   take a bathroom break, I'd ask that you just let me

13   finish my question and you finish your answer.

14   Then we can do that.

15          Is that fair?

16      A.   That's fair.

17      Q.   If something comes to your mind that --

18   you've testified to something that you need to

19   correct or go back and enlarge or explain later on

20   in the deposition, please interrupt me at that

21   point.  I'll let you place your amendment or your

22   correction on the record, but if you don't, I'll

23   assume at the end of the deposition that your

24   answers are to the best of your knowledge,

**JAMES GREIVES**

1    information and belief.

2            Is that fair?

3       A.    That's fair.

4       Q.    What is your job title?

5       A.    My job title right now is vice-president,

6    senior technology manager.

7       Q.    What are, in a nutshell, your job

8    responsibilities?

9       A.    My job responsibility is to work with our

10   correspondent lending clients to help them with any

11   technology needs they may have to deliver loans to

12   Bank of America Correspondent Lending.

13      Q.    What is the relationship between

14   Countrywide Home Loans, Inc. and Bank of America

15   Correspondent Lending?

16      A.    Countrywide Home Loans, Inc. was acquired

17   by Bank of America, I believe, in January of 2009.

18      Q.    Okay.  And what is correspondent lending?

19      A.    Correspondent lending is a process where

20   we purchase closed loans from our clients.

21      Q.    And your attorney is excellent.  So I'll

22   assume that you've been prepared and you're

23   familiar with this action, but suffice to say

24   plaintiffs allege that they made a loan, and it's

**JAMES GREIVES**

1   relatively uncontested, through Money Warehouse.

2            Are you aware of that contention?

3   A.    Yes.

4   Q.    What is C-L-O-U-T?

5   A.    CLOUT is an automated underwriting system.

6   It's an acronym.  It stands for, at that time,

7   Countrywide's Loan Origination and Underwriting

8   Technology.  It's a business-to-business tool used

9   by our clients to help originate loans, to help

10  determine risk levels, to help underwrite loans.

11  It is a tool.

12  Q.    Have you reviewed -- Countrywide and Money

13  Warehouse produced a significant amount of

14  documentation to me.

15           Have you reviewed the loan file in

16  this case?

17  A.    Yes, I have.

18  Q.    Okay.  You would agree with me that this

19  loan was originated by Money Warehouse?

20  A.    Yes.

21  Q.    And you would agree with me that this loan

22  was originated by Money Warehouse through the use

23  of the CLOUT system?

24  A.    I'm not aware of that.

JAMES GREIVES

1     Q.    Okay.  If I were to give you or show you

2  -- I am going to show you this document which I'd

3  like you to mark D-1.

4                        -  -  -

5              (Whereupon, Exhibit D-1 was marked

6              for identification.)

7                        -  -  -

8  BY MR. WEISBERG:

9     Q.    I'm showing you what has been marked as

10  D-1.  The title of it is CLOUT Request Feedback

11  from Money Warehouse, Inc., and in the summary it

12  indicates borrowers, plaintiffs.

13              Can you take a look at that and

14  verify that for yourself.

15     A.    Yes.  I'm familiar with this document.

16     Q.    In reviewing this document, would you, now

17  being refreshed, agree with me that this loan was

18  originated through the CLOUT system?

19     A.    This loan was actually entered -- the data

20  was entered into the CLOUT system for an

21  underwriting decision.  I would not state that it

22  was originated using the system.

23     Q.    Fair enough.  What is the purpose of

24  underwriting, or underwriting a mortgage loan, to

JAMES GREIVES

1    Countrywide's eligible loan programs in this

2    scenario, correct?

3         A.    Can you rephrase that.

4         Q.    Sure.   Money Warehouse, using CLOUT, would

5    determine Countrywide's eligible loan programs?

6         A.    Money Warehouse will use CLOUT to

7    determine eligible loan programs, eligible

8    Countrywide loan programs at that time.

9         Q.    Why are they determining what is

10   Countrywide eligible as opposed to Melon Bank

11   eligible?

12        A.    I do not know why they would come to our

13   system to use it.   It's a system that's available

14   to all of our correspondent clients.

15        Q.    Correspondent lending means that the

16   originator, in this case Money Warehouse, would

17   originate the loan but own the loan for a brief

18   period of time and then later sell it to

19   Countrywide; am I correct?

20        A.    They would actually sell a closed loan to

21   Countrywide, yes.

22        Q.    Right.   Immediately after closing; am I

23   correct?

24        A.    No.

JAMES GREIVES

1      Q.    Shortly after closing?  Would you agree

2  with that?

3      A.    Yes.

4      Q.    At all times Money Warehouse, in order to

5  sell this loan, needs to have the loan meet

6  Countrywide's underwriting guidelines or

7  Countrywide won't buy it, correct?

8      A.    That's correct.

9      Q.    And Money Warehouse does this to make a

10 profit from the sale of the loan, the origination

11 and sale of the loan; am I correct?

12     A.    Yes.

13     Q.    No crime in that?

14     A.    No crime in that.

15     Q.    And Countrywide purchases the loan to make

16 a profit based on the -- to make a profit from the

17 loan, as well; is that correct?

18     A.    Yes.

19     Q.    In this case Countrywide made a profit or

20 makes a profit through the interest paid on the

21 loan; am I correct?

22     A.    Could you rephrase that.

23     Q.    Well, how does Countrywide profit through

24 the purchase of this loan?

**JAMES GREIVES**

1      A.    I can give an answer to that question, but

2   I'm not qualified to answer that as --

3      Q.    Just your personal knowledge.

4      A.    That loan is sold on the secondary

5   mortgage market.  It's based upon the saleability

6   of the loan, of which risk is one of the factors

7   along with the loan itself, the terms it was closed

8   under.

9      Q.    And the secondary market would be sold to

10  a trust or an investor or --

11     A.    Through Wall Street, to my knowledge.

12     Q.    You would agree with me -- you said

13  through Wall Street.  You were just finishing my

14  sentence, correct?

15     A.    Correct.

16     Q.    So in selling the loan on the secondary

17  market, Countrywide needs to make certain

18  representations to that secondary market about the

19  loan's re-payability; am I correct, the loan's

20  affordability to the borrowers?

21     A.    Yes.

22     Q.    And that is that the loan is affordable

23  and repayable; am I correct?

24     A.    No.  Incorrect.

**JAMES GREIVES**

1          A.     What does the loan program name mean?

2          Q.     Yes, as to the characteristics of the

3     terms of the loan.

4          A.     That means the borrower has up to four

5     different payment methods of which to repay that

6     loan.

7          Q.     And what are those four different payment

8     methods?

9          A.     Once again, I'm not qualified as a product

10    specialist.

11         Q.     Just your personal knowledge.

12         A.     Basically, there were four different

13    types.  There is a minute payment, an interest-only

14    payment, a 15-year amortization and, in this case,

15    as the loan term it was a 30-year.  There's a

16    30-year amortization also.  So those are the four

17    different payment types.

18         Q.     And this loan is an ARM; is that correct?

19         A.     Correct, adjustable rate mortgage.

20         Q.     After how much time would the rate adjust?

21    I'll show you whatever you want me to show you.

22         A.     The information is outlined on the note.

23    Again, I'm not a product specialist.

24         Q.     Based on your best knowledge, information

**JAMES GREIVES**

1  and belief.

2       A.   One month.

3       Q.   Okay.  It would adjust upward; am I

4  correct?

5       A.   No.

6       Q.   Well, I would suggest to you that this is

7  not a variable rate loan, and I'm sure your

8  attorney would agree.

9            Then, thereafter that one month,

10  when would it adjust again?

11       A.   Again, I don't know.  I don't have a copy

12  of the note.

13            MR. WEISBERG:  Off the record.

14                 -  -  -

15            (There was a discussion held off the

16            record.)

17                 -  -  -

18  BY MR. WEISBERG:

19       Q.   How about I show you D-3.

20            Does that give you better

21  information?

22       A.   No, it does not.

23       Q.   Okay.  I'm showing you D-4 where it says

24  amortization type.  It has one MTA.

JAMES GREIVES

1          Do you know what that means?

2      A.   Yes.  That's a one-year ARM.  The mortgage

3  treasury indices.

4      Q.   And what is the purpose of that uniform

5  residential loan application?

6      A.   It is a loan application.

7      Q.   For what purpose, though?

8      A.   For obtaining a loan.

9      Q.   I understand that.  Is it to initially

10  underwrite risk?

11      A.   It is to gather characteristics that a

12  borrower possesses.

13      Q.   And how would Money Warehouse come to the

14  conclusion that at least based on the initial

15  indicia this loan fit within that program?

16      A.   I do not know that.

17      Q.   Would that be based on CLOUT?

18      A.   No.

19      Q.   Is this -- the uniform residential loan

20  application is prior to the input into CLOUT?

21      A.   Correct.

22      Q.   Of the 200-plus loan products available to

23  the plaintiffs, why was it determined that they

24  were to be placed into this loan program?

**JAMES GREIVES**

1      A.    I do not know that.

2      Q.    Who would know that?

3      A.    The person who input that loan into our

4  system.

5      Q.    Why did your system determine -- doesn't

6  your system determine the appropriate loan program?

7      A.    The system determines the appropriate loan

8  program selected by the user.

9      Q.    Is there any indications in any of the

10  documents that you've reviewed that any other

11  programs were suggested by CLOUT for this loan?

12      A.    No.

13      Q.    So CLOUT suggested this program?

14              MR. TASCA:  Object to the form.

15              THE WITNESS:  No.  No.

16  BY MR. WEISBERG:

17      Q.    Well, how is the program -- how does Money

18  Warehouse determine the program?

19      A.    I do not know that.

20      Q.    They determine it based on CLOUT, which is

21  Countrywide's underwriting guidelines?  Would you

22  agree with me?

23      A.    That's not the question.  Could you

24  rephrase your question.

JAMES GREIVES

1  Q.  Sure.  That Money Warehouse determines the

2  loan program based on CLOUT, which is a computer

3  system of Countrywide's underwriting guidelines?

4  A.  No.

5  Q.  Explain, please.

6  A.  The CLOUT system gives you the ability to

7  input loan programs.  In this case, from what I've

8  reviewed, the user actually selected the loan

9  program of that pay option ARM, one-year MTA with a

10  three-year hard prepay.  That was a loan program

11  that was available at the time and it was offered

12  at the time that that loan was processed through

13  our system.

14          The user entered into our system,

15  selected an ARM and specifically selected that loan

16  program.  They had to select the ARM because that

17  loan program only appears under an ARM.  It's an

18  ARM loan program.

19          They selected that loan program.

20  They sent it into our system for an evaluation of

21  risk, and, as D-1 indicates, the decision or the

22  risk came back as an accept.

23  Q.  And what other -- based on your review of

24  the file, what other other loan programs were

JAMES GREIVES

1    available to be selected by Money Warehouse?

2        A.   Could you rephrase that.

3        Q.   Sure.   What other options did Money

4    Warehouse have other than this loan program?

5        A.   At what time in the process?

6        Q.   Does CLOUT generate loan program options?

7        A.   If selected by the user, yes.

8        Q.   And is it your testimony that the user,

9    meaning Money Warehouse's employee, did not select

10   to receive whatever options were available?

11       A.   Correct.

12       Q.   They selected only the -- they selected --

13   the option that they selected was an ARM; is that

14   correct?

15       A.   Yes.

16       Q.   Were there any other options available?

17       A.   The option that they selected was an ARM

18   and, as I stated previously, they selected the loan

19   program of the pay option ARM, one-year MTA,

20   three-year hard prepay.

21       Q.   Do you know why they selected that?

22       A.   No.

23       Q.   Do you know if any other loan programs

24   were available to be selected?

JAMES GREIVES

1      A.    Could you rephrase that.

2      Q.    Sure.  Do you know if any other loan

3  programs were available to be selected by Money

4  Warehouse?

5      A.    Yes.

6      Q.    Based on CLOUT's underwriting of

7  plaintiffs; not whether or not Countrywide has

8  200-plus other loan programs?  Do you know based on

9  CLOUT?

10     A.    At the time the user input that loan, they

11 made the decision, as I stated earlier, to select

12 an ARM.  When the ARM appears, all the ARM programs

13 will appear below that.  They made the selection of

14 the pay option product that we've been discussing.

15     Q.    My question is:  Would plaintiffs have

16 been eligible for anything other than an ARM?

17     A.    I don't know that.

18     Q.    Would you agree with me that on the

19 secondary market, an ARM has a higher profitability

20 for Countrywide than a conventional fixed rate?

21     A.    I do not know.

22     Q.    Who would know that?

23     A.    Someone in capital markets.

24     Q.    Would you agree with me that an ARM is

JAMES GREIVES

1    often indicative of a higher risk borrower?

2        A.    I do not know that.

3        Q.    Who would know that?  Underwriting?

4        A.    Yes.

5                        -   -   -

6                (Whereupon, Exhibit D-5 was marked

7                for identification.)

8                        -   -   -

9    BY MR. WEISBERG:

10       Q.    Turning your attention to D-5, entitled

11   Notice of Right to Cancel.  Then stamped on all of

12   D-5, which is four pages, is June 9, 2006.

13               Are you familiar with the Truth in

14   Lending Act requirements of -- as they pertain to

15   notices of right to cancel?

16       A.    Yes.

17       Q.    You're familiar that a borrower has three

18   days, including Saturday but not including Sunday,

19   to cancel or rescind a refinance mortgage loan?

20       A.    Yes.

21       Q.    You would agree with me that D-5 -- I'm

22   going to show you what I'm now marking as D-6.

23                       -   -   -

24               (Whereupon, Exhibit D-6 was marked

**JAMES GREIVES**

1         Are there any other notices of right

2    to cancel within your loan file that I do not have?

3         A.    I do not know that.

4         Q.    You would agree with me that giving one to

5    each borrower is a violation of the Truth in

6    Lending Act?

7         A.    Yes.

8         Q.    Is there anything within your file

9    whatsoever that indicates that, in fact, the

10   borrowers came back and had another signing at

11   Money Warehouse?

12        A.    I'm not aware of that.

13        Q.    You would agree with me that if there were

14   forgeries on D-7, that these documents would be

15   invalid?

16        A.    Yes.

17        Q.    You would agree with me that D-5, the June

18   9th date, your underwriting department deemed

19   defective?

20        A.    Incorrect.

21        Q.    Then why did they reissue notices of right

22   to cancel if they didn't deem them to be defective?

23        A.    It was actually our purchasing department

24   reviewing the loan requesting that the rescission

**JAMES GREIVES**

1    period be reopened and new documents be obtained

2    before that loan would fund.

3        Q.   Why?

4        A.   Because the original document had an

5    incorrect date.

6        Q.   If your purchasing department finds that

7    D-5 had an incorrect date, then why do you

8    disagree?

9        A.   With what?

10       Q.   Your purchasing department.  Why is the

11   parenthetical that you had spoken of before, why is

12   that not enough?

13       A.   As a move of caution to be accurate and to

14   be fair to the borrower, we requested that that

15   document be resigned.

16       Q.   Would you agree with me that the

17   parenthetical could make this document, D-5,

18   confusing?

19       A.   No.

20                MR. WEISBERG:  I'm going to show you

21            D-8.

22                        -    -    -

23                (Whereupon, Exhibit D-8 was marked

24            for identification.)

JAMES GREIVES

1                        -   -   -

2    BY MR. WEISBERG:

3        Q.   Are you familiar with what an allonge is?

4        A.   Yes.

5        Q.   Is that permanently affixed to the note?

6        A.   Yes.

7        Q.   Okay.  By what means?

8        A.   By what means?  Can you clarify that.

9        Q.   Staple, paper clip.  If you don't know,

10   you don't know.

11       A.   I do not know.

12       Q.   Okay.  Have you seen this -- are you

13   presuming it to be permanently affixed or have you

14   actually seen it to be permanently affixed?

15       A.   I have not seen it to be permanently

16   affixed.

17       Q.   What is platinum lender access?

18       A.   That's the name of the correspondent

19   lending web site provided by Bank of America

20   Correspondent Lending.

21       Q.   And platinum lender access offers broader

22   abilities than CLOUT?  CLOUT is a subdirectory of

23   platinum lending access?

24       A.   Yes.

JAMES GREIVES

1  admissions.

2          Were you the one that was the

3  respondent to do these request for admissions or

4  was it someone else?

5      A.   I was part of that.

6      Q.   Okay.  I'm going to read to you a request

7  for admission number six.  "When plaintiffs' loan

8  was made, CLOUT was used at the point of sale to

9  help correspondent and loan officers determine the

10  best loan program and pricing for a particular

11  borrower."

12          Would you agree with that?

13      A.   No, I would not.

14      Q.   Why is that?

15      A.   I don't know how they deployed our system,

16  whether it was a point of sale or any part during

17  the origination of that loan program.

18      Q.   Okay.  There was a request -- "Money

19  Warehouse used CLOUT within the platinum site to

20  determine the lowest interest rate, pricing for

21  plaintiffs' loan."

22          Do you agree with that?

23      A.   No, I do not.

24      Q.   Why is that?

JAMES GREIVES

1      A.   I don't know how they used it to determine

2   that because there was payment.

3      Q.   Can CLOUT be used to determine the lowest

4   monthly payment or the lowest interest rate?

5      A.   Yes, it can.

6      Q.   Is that the purpose of CLOUT, to assist --

7   is that one of the purposes of CLOUT, to assist its

8   users to find the best available loans for

9   borrowers?

10      A.   Yes.

11      Q.   Is there any evidence in your review of

12   the loan file that the borrowers were presented

13   with options as to which loan program to choose?

14      A.   No.

15      Q.   This loan was underwritten -- rate sheets

16   were not used, right?

17      A.   I don't know that.

18      Q.   Okay.  Are there any rate sheets in the

19   file that you've seen?

20      A.   No.

21      Q.   What is the most heavily weighted factor

22   in underwriting a loan?  Would you agree with me

23   that it's the FICO score?

24      A.   As I stated earlier, it's one of many

JAMES GREIVES

1  factors.  I cannot state which is the heaviest

2  weighted factor.

3  Q.  Why would someone be approved for an ARM

4  but not a fixed rate loan?

5  A.  I do not know.

6  Q.  Would you agree with me that an ARM is

7  generally approved for higher risk borrowers?

8  A.  No.

9  Q.  Would you agree with me that an ARM is a

10  high risk for the borrower?

11  A.  No.

12  Q.  Why is that?

13  A.  It depends on the borrower.

14  Q.  Why can't you determine whether CLOUT was

15  used to get the lowest interest rate or monthly

16  payment loan for plaintiff?

17  A.  I do not know how they used our system.  I

18  do know that they used it to specifically select an

19  individual loan program.  They did not run any

20  other scenarios through the system other than the

21  pay option one-month ARM.

22  Q.  Do you know if CLOUT gave them the ability

23  to run other scenarios through based on the

24  characteristics of these borrowers?

**JAMES GREIVES**

1     A.    CLOUT has the ability to run many loan

2  scenarios depending on the settings determined by

3  the user.

4     Q.    What does that mean, the settings?

5  Meaning the underwriting factors?

6     A.    Not underwriting factors.   The

7  characteristics of the loan.

8              If I can expand on it.

9     Q.    Yeah.

10    A.    Users have the ability to select fixed

11  amortization or ARM amortization periods.   They can

12  select multiple payment terms; 360, 180.   They can

13  select hybrid or fixed period ARMs.   They could

14  process any type of a scenario through our system.

15             The one determining factor is the

16  payment type, whether it's fixed or ARM.   So if I

17  had selected a fixed and a 360, as we had sent some

18  information over to you per your request on the

19  guide, you would see that there is a feature in

20  there called all.

21             So what it would look at is under

22  all loan programs that are fixed 360 for this

23  example, it would determine eligibility on every

24  loan program that we offered at that time.

JAMES GREIVES

1     Q.    Would you know if that was run?

2     A.    I do know it was not run.

3     Q.    How do you know that?

4     A.    We checked the database.

5           MR. WEISBERG:  Can you give me a

6     two-and-a-half minute break.

7           (There was a brief recess taken at

8     this time.)

9     BY MR. WEISBERG:

10    Q.    And your counsel can feel free to jump in

11    here, but we received, as you know, two different

12    sets of documents.  One was from Money Warehouse

13    and one was from Countrywide.  The June 16th D-7

14    exhibit I pulled from the Money Warehouse set of

15    documents.  Countrywide's documents, I believe,

16    were Bates stamped.  I, actually, didn't see the

17    notices of right to cancel, the June 16th notice,

18    in Countrywide's production.

19          Can explain that to me, or if you

20    don't know, you don't know?

21    A.    I can't explain it.

22          MR. TASCA:  Sitting here right now,

23    I don't know whether they were in there,

24    but I can check.

JAMES GREIVES

1              THE WITNESS:  Correct.

2      BY MR. WEISBERG:

3          Q.    How does Countrywide do that?

4          A.    I'm not qualified to answer that.

5          Q.    Who would be, underwriting?

6          A.    It would be underwriting, other

7      departments.  Again, I'm not sure who that would go

8      to.

9          Q.    Fair enough.

10              MR. WEISBERG:  Thank you.

11              (There was a discussion held off the

12              record.)

13              MR. WEISBERG:  Back on the record.

14      BY MR. WEISBERG:

15          Q.    Your counsel the other day provided me

16      Bates-stamped documents CY0657 through 0667.  The

17      deponent was asked off the record what are these

18      seemingly hieroglyphic documents.  The deponent

19      indicated that the loan program ID920 was, in fact,

20      this loan program ID, the pay option ARM.

21              Am I correct in that summary?

22          A.    Yes.

23          Q.    But, otherwise, tell me more about that.

24          A.    There is also a second piece to that.

JAMES GREIVES

1    After Joe and I spoke initially on this, it states

2    the pay option.   That program number is 920.

3                 MR. TASCA:  For the record, we're on

4             page 662 here.

5                 THE WITNESS:  As I stated earlier in

6             my deposition, Money Warehouse had

7             processed that individual loan through our

8             system, as I stated.  If they would have

9             selected all, that value would say null.

10            Then you would see a whole bunch of loan

11            programs appear.

12   BY MR. WEISBERG:

13       Q.   What if they selected all and only one

14   program was available?

15       A.   You would still see null because null is

16   the assigned value for all.  Actually, all the loan

17   programs would appear right here.  This was the

18   result.  This is probably the best way to show it.

19   Referring to 657 where it says here the decision

20   was accept.

21       Q.   Yes.

22       A.   You would have had many loan programs

23   appearing with the decision for those many loan

24   programs.

**JAMES GREIVES**

1          As I stated earlier, it has the
2   capability to go through and look at all loan
3   programs based upon the amortization type, whether
4   it's fixed or ARM.   In this case, this gave me the
5   indication that they selected an individual loan
6   program.
7       Q.   Okay.
8          MR. WEISBERG:   Joel, I'm not going
9          to mark it because I get it.
10         MR. TASCA:   Okay.
11  BY MR. WEISBERG:
12      Q.   Based on your personal experience, do you
13  know why Money Warehouse would have only selected
14  the ARM?   Is it to their best interest profit-wise?
15      A.   I do not know why.
16         MR. WEISBERG:   Okay.   We'll have to
17         ask Money Warehouse.   Thank you.
18         (Deposition concluded at 2:19 p.m.)
19
20
21
22
23
24

# EXHIBIT C

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


CIVIL ACTION NO. 09-1503

\*   \*   \*


GREG NULMAN and TATYANNA                 **ORIGINAL**
KNYAZHESKY,

      Plaintiffs,

   vs.

MONEY WAREHOUSE, INC. and

COUNTRYWIDE HOME LOANS, INC,


   Defendants.


\*   \*   \*

March 1, 2010
\*   \*   \*

      Oral sworn deposition of TATYANNA
KNYAZHESKY, held at the law offices of
Ballard Spahr, LLP, 1735 Market Street, 51st
Floor, Philadelphia, Pennsylvania, commencing
at 2:37 P.M. before Sharon L. Martin, a
Federally Approved, Registered Professional
Reporter, Certified Court Reporter-NJ, Notary
Public.


\*   \*   \*



ROYAL
COURT REPORTING

1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

1    assistant and knowing medicine, in legal

2    terms, in finances, I know nothing.  So we

3    trusted that person.

4    Q.    Without getting into the specifics of

5    what Michael Rakita from Money Warehouse may

6    have said to you, why did you want to get

7    another loan in 2006?

8    A.    To get a fixed rate, because it was

9    adjustable for us from World Saving.  And

10   Michael Rakita promised low rate.  He

11   promised my husband much lower than money --

12   that it was on the market.  And, of course,

13   we were able to buy the second property for

14   our son.

15   Q.    So the adjustable rate mortgage that

16   you had from World Savings, you thought that

17   there was a better option out there for you?

18   A.    Exactly.

19   Q.    And that's why you went in 2006 to seek

20   another loan, correct?

21   A.    Yes, correct.

22   Q.    And was it your understanding that your

23   rates were going to be lower on the new loan

24   that you were to get in 2006?



1    A.    Yes.  And fixed rate, he promised my

2    husband it will be fixed rate.

3    Q.    Right.

4          Because you understood that an

5    adjustable rate mortgage could potentially be

6    problematic, because the rate goes up,

7    correct?

8    A.    Correct.

9    Q.    Now, Mr. Nulman testified that you

10   didn't really have any direct contact with

11   the Money Warehouse, I assume either by phone

12   or in person until the day of the closing; is

13   that correct?

14   A.    Yes.

15   Q.    Prior to the closing of the loan, did

16   you ever have any communication or contact

17   with anyone from Countrywide?

18   A.    From Countrywide or from Money

19   Warehouse?

20   Q.    From just Countrywide.

21   A.    No, I didn't.

22   Q.    And the closing day was the first day

23   that you had any contact with Money

24   Warehouse, correct?


ROYAL
COURT REPORTING

1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

1  A.    We got several calls from Michael

2  Rakita.   He wanted to make sure my husband

3  would agree to the terms on loan, on the

4  mortgage loan.   So he kept bombarding us with

5  his calls, of course.   But he never mention

6  about Countrywide.   He said, I would get

7  you -- and I actually spoke with him on the

8  phone a couple times and he promised me as

9  well, I will get you the best rate as

10 possible, you have very high FICO score.

11     At the time my FICO score was around

12 800, 780, I don't remember exactly.   So it

13 was pretty high.   My ex-husband's rate -- I

14 mean, FICO score was as high as mine, maybe a

15 little bit less, several points less.   So he

16 thought if our FICO score so high, he would

17 get us very good rate and we would refinance

18 and buy a second property.   And we will not

19 be a lie.   He was from our Russian community

20 and we were not thinking about that.

21 Q.    So these were conversations that you

22 personally had directly --

23 A.    Yes.

24 Q.    -- with Mr. Rakita, correct?



1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

1    A.    Yes.  He said to me on the phone that

2    everything is explained to your husband,

3    please make sure he understands.  And he

4    tried to talk to me on the phone.  And I

5    wasn't into that at that point.  My mom was

6    dying in the hospital.  So I said, If you

7    explain everything to my husband, probably

8    everything is right.

9         And he said, Yes, and I'm going to get

10   you the best possibly rate, fixed rate with

11   the best company I can get for you.  That's

12   what he promised us.

13        So Countrywide probably was the best

14   company at that time.  But not at the rate to

15   with our FICO scores.

16   Q.    Now, when you went to -- well, let

17   me -- just by way of foundation, and I think

18   you may have even testified to this already,

19   was Mr. Nulman's account of how you signed

20   the loan documents accurate?

21        In other words, you went the day of the

22   closing, but after the actual closing took

23   place, you went to the Money Warehouse and

24   signed the loan documents at that point; is



ROYAL
COURT REPORTING

1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

1    that correct?

2    A.    Yes.

3    Q.    Would you please take a look at

4    Exhibits 1, Nulman-1, Nulman-2 and Nulman-3

5    and tell me if those are three of the

6    documents that you signed at the loan

7    closing?  Well, strike that.  The day of the

8    loan closing.

9    A.    Everything was signed only on the day

10   of settlement, which was June 9th.  I didn't

11   sign anything after that.

12   Q.    But my question is whether you signed

13   the documents that we've marked as Exhibits

14   Nulman-1 --

15   A.    Yes.

16   Q.    -- 2 and 3?

17         The answer is yes?

18   A.    Yes.  I have my signature here.  I did

19   sign it.

20   Q.    Did you read any of those documents

21   before you signed them?

22   A.    I didn't -- everything was explained to

23   me in Russian.  I mean, it was a lady who was

24   Russian speaking and she said everything was



1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

1     explained to you and to your husband.  He

2     already signed, sign, please.  And it was

3     already signed by my husband.

4                    MR. WEISBERG:  Wait, slow down.

5                    I think -- you said everything

6     was explained to you in Russian, then you

7     said -- essentially said not everything was

8     explained to you in Russian.

9                    THE WITNESS:  Okay.

10                    MR. WEISBERG:  Explain --

11    explain what was explained to you in Russian

12    or not.

13                    THE WITNESS:  I came -- I came

14    after hospital to sign the papers.  It was

15    Russian speaking lady that said, Your husband

16    already signed it, please sign and I did.

17                    MR. WEISBERG:  Okay.

18    BY MR. TASCA:

19    Q.    And your testimony is that you didn't

20    read the documents before you signed them?

21    A.    I didn't.  She explain it to me in

22    Russian.

23    Q.    What did she explain to you in Russian?

24    A.    She said, You're signing fixed rate,



ROYAL
COURT REPORTING

1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

Page 23

1   everything sign by your husband, please sign.

2   Q.     The woman told you it was a fixed rate

3   mortgage?

4   A.     Yes, she did.

5   Q.     What was her name?

6   A.     I don't remember.  It was middle age

7   female.  Blonde, I think.  And very nice and

8   smiling, of course.

9   Q.     Middle aged, blonde woman; do you

10  remember anything else about her?

11  A.     I don't, I apologize.

12  Q.     Don't apologize.

13         Did you ask the woman if you could read

14  the documents before you signed them?

15  A.     I don't remember, but I think I tried,

16  I tried to read.  And she said, It's so late,

17  would you be quicker?

18         Because I came after hospital.  I don't

19  remember, but it was late.

20  Q.     And when she said that, did you say to

21  her, No, no, no, I really should read these

22  before I sign them?

23  A.     I don't remember what I said, but she

24  got upset with my answer.  I remember that.


ROYAL
COURT REPORTING

1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

1    Q.    So you just went ahead and signed them

2    without reading them?

3    A.    I tried to read, probably took longer

4    than she expected and she got worried.

5    Q.    And --

6    A.    But I signed them, I did.

7    Q.    And did you see on these documents

8    where -- where it states, for example, at the

9    very top of Exhibit number 2, Adjustable Rate

10   Rider; did you see that?

11   A.    To be honest with you, I don't

12   remember.  Now, I do see that.  But at that

13   time when my mom was dying, I don't know if I

14   even paid attention.  And, plus, my husband

15   spoke -- he had so many conversation with

16   Mike and he promised him the best rate, fixed

17   rate, everything will be fine.  So I didn't

18   pay much -- much attention.  I trusted both

19   of these people.

20   Q.    Now, take a look at Exhibit number 4.

21   Does that appear to be your signature on the

22   second page of Exhibit number 4?

23   A.    Yes, it's my signature, but different

24   date.  It's fabrication.  It's -- the only



ROYAL
COURT REPORTING

1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

1    time I was there and signed any papers,

2    100 percent, was the date of the settlement.

3    And this date was stamped.  So they probably

4    fabricated that.

5    Q.    So you didn't sign --

6    A.    I did sign, but no -- not on June 16th.

7    On June 9th.

8    Q.    You didn't receive in the mail any

9    documents a week or so later after the

10   closing --

11   A.    No, I didn't.

12   Q.    -- that you signed?

13   A.    Everything was signed on the date of

14   settlement, 100 percent.

15   Q.    Did you receive any documents from

16   Countrywide that you -- about a week after

17   the closing that you signed and returned?

18   A.    No, I didn't.  I didn't even know that

19   it was our mortgage company.

20        MR. TASCA:  Let's go off the

21   record just for a minute.

22        (Off-the-record discussion)

23        MR. WEISBERG:  I'll stipulate

24   that our damages claim is not that the events



**ROYAL**
COURT REPORTING

1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

1   giving rise to the Complaint gave rise to

2   their marital breakup.

3              MR. TASCA:  Let's just mark as

4   Knyazhesky number 1.

5              (Exhibit Knyazhesky-1, Notice

6   of Right to Cancel, is marked for

7   identification)

8   BY MR. TASCA:

9   Q.    Miss Knyazhesky, I'm showing you what

10  we've marked as Knyazhesky Exhibit 1.

11       Now, this document is a Notice of Right

12  to Cancel.  It's actually four copies of the

13  Notice of Right to Cancel, two are signed by

14  you and two are signed by your husband.  And

15  these documents are dated June 9th, the date

16  of the closing.

17       Are these documents that you were

18  presented with and signed on June 9th?

19  A.    Yes.

20  Q.    And these are documents that your

21  husband was presented with and signed on

22  June 9th?

23  A.    I believe so.  Everything was signed on

24  the date of the settlement, not after.



Page 27

1    Q.    Okay.  So you don't have any reason to

2    doubt that these documents were part of the

3    settlement package that you were given on the

4    date of June 9th, correct?

5    A.    Yes.

6    Q.    And I'm referring, for the record,

7    Knyazhesky Exhibit 1.

8          When was the first time,

9    Miss Knyazhesky, that either you or your

10   husband became concerned that you had entered

11   into a loan that didn't have terms that were

12   as favorable as you thought they were?

13   A.    Probably six to eight months after the

14   settlement, when we needed to pay our

15   property taxes and we had no money for that.

16   That's when my husband disclosed to me what

17   happened.

18   Q.    Okay.

19   A.    And I believe it was in some --

20   sometime in the Fall.

21   Q.    Okay.  Subject to any questions

22   Mr. Weisberg may have, I am done.

23              MR. WEISBERG:  I'm done, too.

24              MR. TASCA:  Thank you very


ROYAL
COURT REPORTING

1831 Chestnut Street, 9th Floor, Philadelphia, Pennsylvania 19103
Phone: (215) 732-0655 Toll Free: (888) 595-7277 Fax (215) 732-7655
www.royalcourtreporting.com

1    much, Miss Knyazhesky.

2                    THE WITNESS:  Thank you.

3                    (Witness excused)

4                    (Testimony concluded at

5    3:04 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



# EXHIBIT D



# NOTICE OF RIGHT TO CANCEL



EXHIBIT 2
Knyazhesky-1
3/11/10   sm

Loan Number: 0016503002

Borrowers: GREGORY NULMAN, TATYANA KNYAZHESKY

Property Address: 796 BOBWHITE LANE, HUNTINGDON VALLEY, PENNSYLVANIA 19006

---

**YOUR RIGHT TO CANCEL**

You are entering into a transaction that will result in a mortgage, lien or security interest on or in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1. the date of the transaction, which is  JUNE 9, 2006                     ; or
2. the date you receive your Truth in Lending disclosures; or
3. the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the *fact* that the mortgage, lien or security interest on or in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at
MONEY WAREHOUSE, INC
75 JAMES WAY, SUITE 120
SOUTHAMPTON, PENNSYLVANIA 18966

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of  JUNE 12, 2006
(or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL.**

_____          _____
Consumer's Signature                                          Date
GREGORY NULMAN

---

**ACKNOWLEDGMENT OF RECEIPT**

EACH OF THE UNDERSIGNED HEREBY ACKNOWLEDGES THE RECEIPT OF TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL.

_____          JUN 0 9 2006
GREGORY NULMAN                                     Date

---

none.msg

CWIDE0205




# NOTICE OF RIGHT TO CANCEL

Loan Number: 0016503002

Borrowers: GREGORY NULMAN, TATYANA KNYAZHESKY

Property Address: 796 BOBWHITE LANE, HUNTINGDON VALLEY, PENNSYLVANIA 19006

---

**YOUR RIGHT TO CANCEL**

You are entering into a transaction that will result in a mortgage, lien or security interest on or in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1. the date of the transaction, which is   JUNE 9, 2006                ; or
2. the date you receive your Truth in Lending disclosures; or
3. the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien or security interest on or in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at
MONEY WAREHOUSE, INC
75 JAMES WAY, SUITE 120
SOUTHAMPTON, PENNSYLVANIA 18966

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of  JUNE 12, 2006
(or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL.**


_____          _____
Consumer's Signature                       Date
TATYANA KNYAZHESKY

---

**ACKNOWLEDGMENT OF RECEIPT**

EACH OF THE UNDERSIGNED HEREBY ACKNOWLEDGES THE RECEIPT OF TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL.


_____          JUN 0 9 2006
TATYANA KNYAZHESKY                         Date

---

NOTICE OF RIGHT TO CANCEL/RESCISSION MODEL FORM H-8 (GENERAL)
03/17/06

DocMagic *eFORMS* 800-449-1362
www.docmagic.com

 

# NOTICE OF RIGHT TO CANCEL

Loan Number: 0016503002

Borrowers: GREGORY NULMAN, TATYANA KNYAZHESKY

Property Address: 796 BOBWHITE LANE, HUNTINGDON VALLEY, PENNSYLVANIA 19006

**YOUR RIGHT TO CANCEL**

You are entering into a transaction that will result in a mortgage, lien or security interest on or in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1. the date of the transaction, which is   JUNE 9, 2006          ; or
2. the date you receive your Truth in Lending disclosures; or
3. the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien or security interest on or in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at
MONEY WAREHOUSE, INC
75 JAMES WAY, SUITE 120
SOUTHAMPTON, PENNSYLVANIA 18966

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of  JUNE 12, 2006 (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL.**

_____       _____
Consumer's Signature                          Date
GREGORY NULMAN

**ACKNOWLEDGMENT OF RECEIPT**

EACH OF THE UNDERSIGNED HEREBY ACKNOWLEDGES THE RECEIPT OF TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL.

_____    JUN 0 9 2006
GREGORY NULMAN                              Date

NOTICE OF RIGHT TO CANCEL/RESCISSION MODEL FORM H-8 (GENERAL)
03/17/06

DocMagic *eForms* 100-648-1362
www.docmagic.com

 

# NOTICE OF RIGHT TO CANCEL

Loan Number: 0016503002

Borrowers: GREGORY NULMAN, TATYANA KNYAZHESKY

Property Address: 796 BOBWHITE LANE, HUNTINGDON VALLEY, PENNSYLVANIA 19006

---

**YOUR RIGHT TO CANCEL**

You are entering into a transaction that will result in a mortgage, lien or security interest on or in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1. the date of the transaction, which is   JUNE 9, 2006                ; or
2. the date you receive your Truth in Lending disclosures; or
3. the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien or security interest on or in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at
MONEY WAREHOUSE, INC
75 JAMES WAY, SUITE 120
SOUTHAMPTON, PENNSYLVANIA 18966

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of JUNE 12, 2006 (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL.**

_____          _____
Consumer's Signature                     Date
TATYANA KNYAZHESKY

---

**ACKNOWLEDGMENT OF RECEIPT**

EACH OF THE UNDERSIGNED HEREBY ACKNOWLEDGES THE RECEIPT OF TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL.

√   *Tatya*                         JUN 0 9 2006
_____          _____
TATYANA KNYAZHESKY                       Date

---

NOTICE OF RIGHT TO CANCEL/RESCISSION MODEL FORM H-8 (GENERAL)          DocMagic *eForms* 800-649-1362
03/17/06                                                               www.docmagic.com

Marie.com

# EXHIBIT E

# NOTICE OF RIGHT TO CANCEL



Loan Number: 0016503002

Borrowers: GREGORY NULMAN, TATYANA KNYAZHESKY

Property Address: 796 BOBWHITE LANE, HUNTINGDON VALLEY, PENNSYLVANIA 19006

## YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage, lien or security interest on or in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1. the date of the transaction, which is  JUNE 9, 2006                         ; or
2. the date you receive your Truth in Lending disclosures; or
3. the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien or security interest on or in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

## HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at
MONEY WAREHOUSE, INC
75 JAMES WAY, SUITE 120
SOUTHAMPTON, PENNSYLVANIA 18966

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of  JUNE 20, 2006
(or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

## I WISH TO CANCEL.

_____          _____
Consumer's Signature                              Date
GREGORY NULMAN

## ACKNOWLEDGMENT OF RECEIPT

EACH OF THE UNDERSIGNED HEREBY ACKNOWLEDGES THE RECEIPT OF TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL.

_____          JUN 1 6 2006
GREGORY NULMAN                                 Date

NOTICE OF RIGHT TO CANCEL/RESCISSION MODEL FORM H-8 (GENERAL)
03/17/06

DocMagic *EZ*forms 800-649-1362
www.docmagic.com

CWIDE0209

# NOTICE OF RIGHT TO CANCEL

Loan Number: 0016503002

Borrowers: GREGORY NULMAN, TATYANA KNYAZHESKY

Property Address: 796 BOBWHITE LANE, HUNTINGDON VALLEY, PENNSYLVANIA 19006

**YOUR RIGHT TO CANCEL**

You are entering into a transaction that will result in a mortgage, lien or security interest on or in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1. the date of the transaction, which is  JUNE 9, 2006                        ; or
2. the date you receive your Truth in Lending disclosures; or
3. the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien or security interest on or in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at
MONEY WAREHOUSE, INC
75 JAMES WAY, SUITE 120
SOUTHAMPTON, PENNSYLVANIA 18966

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of JUNE 20, 2006 (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL.**

_Consumer's Signature_                         _Date_
TATYANA KNYAZHESKY

**ACKNOWLEDGMENT OF RECEIPT**

EACH OF THE UNDERSIGNED HEREBY ACKNOWLEDGES THE RECEIPT OF TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL.

JUN 1 6 2006

TATYANA KNYAZHESKY                         _Date_

DocMagic EFORMS 800-649-1362
www.docmagic.com

CWIDE0210

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GREG NULMAN and            :
TATYANNA KNYAZHESKY,   :
                                  :
      Plaintiffs,            :
                                    :
        v.                :     CIVIL ACTION NO. 2:09-cv-01503-JF
                                    :
MONEY WAREHOUSE, INC. and  :
COUNTRYWIDE HOME LOANS, INC.  :
                                    :
      Defendants.        :

## AFFIDAVIT OF NEAL BUTALA

STATE OF CALIFORNIA         )
                             )  SS.
COUNTY OF VENTURA         )

      Neal Butala, being duly sworn according to law, deposes and says:

      1.     I am a risk closure analyst for Bank of America Correspondent Lending.

      2.     I have reviewed the loan file for the loan made by the Money Warehouse, Inc. ("MW") to Greg Nulman and Tatyanna Knyazhesky (collectively, "Plaintiffs") on June 9, 2006.

      3.     I also have reviewed the AS400 LS, and the MERS Milestones related to this loan.

4.      Based on my review of these documents, I have determined that Plaintiffs' loan was assigned by MW to Countrywide Bank, FSB ("Countrywide Bank"), and not to Countrywide Home Loans, Inc. ("CHL").  CHL has never been assigned Plaintiffs' loan.

Neal Butala

Sworn to and subscribed
before me this 11th day
of March, 2010.

Notary Public

My Commission Expires:

5/23/2010

DARREL DU PUY
Commission # 1669198
Notary Public - California
Los Angeles County
My Comm. Expires May 23, 2010